All righty, the next case of the afternoon is number 18, 31203, Barrios v. Centaur, where's John Schrond. May it please the court. The specific question that we're going to be focusing on today is whether a contract that requires the use of vessels is a maritime contract, but that is subject to an overarching question, a question that has plagued this court for more than 30 years. And all of you have been involved in those decisions. Judge Jones, it was 29 years ago that you suggested a way out of it in your Lambert-Lewis v. Glendale case, but the court wasn't ready to get us out of this issue. She was only 10 at the time. Yes. Judge Haynes, you and I did hokey pokey on this issue. You may remember that a number of years ago in a case I argued involving Davison Sons, the key case that has plagued this court all these years. But the struggle is whether or not in these mixed contracts, where there's vessel involvement and maybe non-vessel involvement, whether what we want to do is look at the specific service or not in a mixed contract. And that was what Davison Sons did, and that was what this court finally rejected, albeit in an oilfield context, a year ago in the Dwaran-Anbrock. And that is what we have at issue here today, because we have a non-oilfield contract, yet it was a non-oilfield contract that caused the Dwaran decision. It was the Kirby case, Justice O'Connor's landmark case, involving a train derailment in Alabama, and that train derailment in Alabama was maritime. Why was it maritime? It was because that contract involved substantial use of a vessel. No, it's not. It was because the principal purpose was maritime commerce, transporting goods from Korea to the U.S. But what she said was, when we look at the principal purpose, and it was quoted twice, interestingly, in Dwaran, is what makes that contract maritime is substantial use of a vessel. In a mixed contract, what you have to have is substantial use of a vessel. And she said that, and this court quoted that same statement twice in Dwaran. And let's look at that. That's prong two of Dwaran, right? Pardon? That's prong two of Dwaran. Well, prong one just requires that there be activity, oil and gas in that case, on navigable water. Well, the point, and that was to explain that we have always considered drilling oil and gas on navigable waters to be maritime commerce. Exactly, and that's the key. Exactly, that's the key. And that was the mistake the district court made. So why is building a dock that is attached to the land also maritime? Well, it's maritime for two reasons. Well, actually, for more than two reasons. One of those is because this dock could not have been built without the use of vessels. The testimony from both parties, the testimony of both parties in this case, was that, here's Taylor Ray, and he signed the bid proposal. He said, no question for this particular, this is on 1090 of the record. He said, no question for this particular job, the crane barge was needed to properly perform the job for UBT. No question, the crane barge was needed. And it was needed for the same, just before I get to the rest of the record, it was needed for the same reason as in the Crescent Energy case. This dock, and you can look in the picture which you have before you in the record excerpts, it's the last record excerpt. There's no room on the dock for all this work to be done. It's identical to the situation in Crescent Energy. Crescent Energy is the case in which you have three small platforms. You are doing, in Crescent Energy, which this court decided after Dwarf, what you have in Crescent Energy is you have a non-maritime activity, which has been non-maritime for at least 30 years, and that is wireline work, plugging and abandoning, on three fixed platforms in Louisiana waters. There isn't enough room to perform the work. That is essentially Dwaron, and that is precisely the problem that Dwaron was addressing. And this, to me, is arguably different because docks are connected to the land. Except the Supreme Court. So if you used a crane moored in the water to build a casino on the land, you're saying that would be a maritime contract. If it was required that there be substantial use of vessels, then that's going to be a question that you're going to have to decide because it's different with docks. Your court, Trotty and Thompson, has held that construction of docks is maritime commerce. What case? Trotty and Thompson. How do you spell Trotty? It's T-R-O-T-T-I and Thompson versus Crawford. It's 1980. And they held that that was maritime commerce. And so the reason that this case is even a stronger case for maritime jurisdiction, Judge, is that this is not just building a dock. This is a case where what they're doing is they're protecting the Mississippi River from pollution from the cargo. And that's different. I teach maritime environmental at U of H, and the maritime law has a strong public policy protecting our navigable waters from pollution, from coal going into the Mississippi River. In fact, the very first environmental statute that was enacted in this country nationally was the Rivers and Harbors Act in 1899, which prevents this exact, the coal going into the water. So this is actually more maritime than the situation that you have in just building a dock like in Trotty and Thompson. I thought an important part of what you're relying on here is not only that the barge ended up being significant, but that the parties always intended that and that the contract said that the price was actually set in part on the fact that the barge would have to be there for the pouring of the concrete. And that follows the test from Duara. The question is what test are we going to apply here? Well, I guess my question really was, I mean, it was in the contract, not just in the reality of what had to be done there, but it was what the parties anticipated going in. That's correct. And if we look at the Crescent Energy case, the Crescent Energy case says it's the expectations of the parties that count. It's the expectations. And the expectations here, going into the- Your Honor, I propose the test. It's in the required group. And that test, what that test does is it requires just like, what's the difference between this and oil and gas activity? Because we know, for one thing, oil and gas, as the Supreme Court ruled when they overturned this court, oil and gas activity is not maritime. It is not maritime. The Supreme Court, this court had gone down that path and was overturned by the Supreme Court in Herbs Welding v. Gray. What is maritime? You take a non-maritime activity, something purely non-maritime like oil and gas activity, and you put it on navigable waters. What makes that maritime? What makes that maritime? What makes it maritime is when you have substantial use of the vessel. That's what makes it maritime. That's what made the mixed contract in Kirby maritime was that there was substantial use of the vessel. And that's what makes it maritime in this case. Because look at the- compare the contracts in Crescent Energy and in this case. The face of both contracts provided that vessels were going to be necessary. Why were vessels necessary? Vessels were necessary because the platforms didn't have room for the work in Crescent Energy. The platforms didn't have room- excuse me, the dock did not have room in this case. So it was necessary that vessels be involved. And I already gave you the testimony in the first place from Taylor Roy. We don't need to know about the testimony, Mr. Armstrong. We know the facts. Okay. Both parties to this contract believed going in, the expectations- They knew they had to use the barge. You don't need to repeat that. So basically you're saying Judge Rosenthal is wrong in the lightering decision. Lightering is wrong. Lightering is wrong because it makes the mistake that it says, is the activity oil and gas is a substitute for the broader question, is this maritime commerce? And that's not true. That's just not true, Your Honor. Because we know that that directly would contradict the Supreme Court in Herbs Welding v. Gray on page 425 of that opinion, 470 U.S. 414 and 425. The court ruled when it reversed this court, which had gone down that exact path, and the court was reversed because exploration and development of oil and gas are not themselves maritime commerce. They're not. Just like you can argue that building a dock is not maritime commerce. You can argue that. It contradicts Trotty and Thompson from this court. But it still is not maritime commerce for oil and gas activity. And it contradicts 30 years, including Judge Jones, your own opinion just a couple of years ago in the Petrobras case, where on page 218 of that opinion, you said development of resources on the OCS is not a traditional maritime activity. It's not. It's not. What makes it a maritime activity is the substantial use of vessels. And the Supreme Court, back in Rodrigue, in the great Rodrigue v. Ethnic Casualty and Surety in 395 U.S. something, back in 1969, Justice White said, when he said that platforms are not maritime and they're an extension of the land, he compared it to the extension of land in piers. And so when we talk about maritime activity, you can say that, you can argue that drilling, well, we know that drilling is not maritime. What makes it maritime is when there is substantial use of vessels. And so the same is true here. Although your court has ruled in Trotty and Thompson v. Crawford in 1980 that constructing a dock is a maritime activity. If Trotty and Thompson is such a key case, why is it only cited in a footnote in your case? Because I didn't know what they were going to argue. It's in the reply brief. It's discussed in the text at length. And so the point is here, Justice O'Connor held that the fundamental interest giving rise to admiralty jurisdiction is the protection of maritime commerce. In this case, we have a contract that could not have been completed without vessels by the testimony of both sides. And the injury occurred, unlike in Crescent where the injury was on the platform, the injury here occurred because of the use of those vessels  Therefore, the need for protection of maritime commerce by application of maritime law is the case here. And so I pray that you reverse the grant of summary judgment on the maritime contract. All right. Do you have a chance for rebuttal? And we'll hear from Mr. Squattery. Good afternoon. Good afternoon. Glad you're all here for Centaur LLC. And, Your Honor, I'll start with what you picked up on the Trottie case. The Trottie case is a status case for longshoremen. The court in Kirby clearly said that there's an entirely different test  You're talking about jurisdiction and status of the employees and you're talking about a contract case, whether or not it is maritime and maritime commerce. That is why Trottie has absolutely no application here today. Your Honor, when at the district court level, there was no disagreement whatsoever on what the test was. In our briefing, and when we were in oral argument, it was very clear. When you pull up and, Your Honor, you asked for pinpoint sites on the record, when you look at the last sentence of 1039 and the first sentence of 1040, that is River Ventures' brief opposing our summary judgment. In that, right there, they say the first question that needs to be asked is, is there maritime commerce? The second question is, is there substantial use of the vessels? On appeal, that is totally changed on what they believe that the test is. But, you know, can you waive a test? Or forfeit, or whatever the right term is, because the law is the law. It's like if you didn't cite the Supreme Court decision on X in the district court, that doesn't stop you from citing it here. It just is irritating. Judge, I totally agree that the law is the law. And I understand where you're coming from on that. This is more of a discussion on that when we read footnote 52 to Duaron, we read it just like they read it. And just like Judge Rosenthal read it when she did Liger. So, let's look at footnote 52. And what we did was, once we started hearing that there was some question that the test was different than what we thought it was at the district court, we wanted no question on it. We put a chart on page 28 of our brief. We wanted to stand by exactly what we thought the test was. And I have extra copies of it, if your honors want it. It is the first question to be asked, and I'm going to use this mark through the case a lot to make sure we understand what the test is. The first question to be asked from Duaron is, is the contract going to provide services to facilitate drilling and production of oil and gas? Yes or no? Now, in Duaron, it was yes, because that was for production of oil and gas. And if it wasn't for footnote 52, we would be here questioning whether or not we had to go back to the Davis and Sons factors to determine whether it was a maritime contract. But this court in its en banc decision, knowing that would be the question you would ask, gave us footnote 52. And we thought it couldn't be more clear, they thought it couldn't be more clear at the district court, as well as Judge Mwaza, when we look at it, it says, this is from Duaron, from the en banc decision, we deal here today only with determining maritime or non-maritime nature of contracts involving exploration, drilling, and production of oil and gas. If an activity is non-oil and gas, like what we have today, and involves maritime commerce and work from a vessel, we would expect this analysis to be helpful. We took that as, from footnote 52 of the en banc decision, if we have maritime commerce and activity with a vessel, the first question was maritime commerce from 52. That doesn't just come from 52, though. When you look at Duaron, and what's being cited by Judge Davis in Duaron, it clearly comes from Kirby. So we clearly have commerce here. Where do you draw the line between maritime and non-maritime physically? Because we've got a dock that's in the water, but it's a dock that's attached to the land. So where does the maritime begin and end in this physics? Your Honor, that is the question that we look to Kirby for. Because Kirby tells us, how do we look at a maritime contract? Because if we're just looking at, they're talking about spaceship, you know, Justice O'Connor talked about spaceship. If you're looking at a spaceship, that's a train in Alabama. But Justice O'Connor was focused on looking at the contract, so okay. We're looking at the contract. The contract has to do with the dock. And so it's not purely land-ish, because you don't really need a dock in the middle of land. You need a dock in water. And yet the dock is connected to the land, and it's not itself water. So that's why I'm asking you, where is this line? Because we know this is about commerce, so the only question is maritime or non-maritime commerce, not is it commerce or something else, charity or something. So tell me that. That's what I'm asking you, very specific. Well, the question about how do we get to maritime or non-maritime, I still think we look at curbing, and we have to back up, and we have to say, what are we doing here? You know, and it is on-land construction. It's being performed by non-Jones Act seamen. We know that now that the district court issued their ruling. So when we look that it's on-land construction, that is where the object of the contract is going to be done. And we back up and we look at what is the principal purpose? That's that threshold question. Because that question is not just going to... But if I'm standing in the water, hammering a nail into the dock, and is that on-land construction? It is, Your Honor, because when you back up and look at it, what is the object of that contract? What are you doing? I am building something on land. I think it changes as you get out in the Gulf of Mexico and you're doing something. So the extensive use of the barge and the tugboat are completely irrelevant for these purposes, is that right? For the first question, Your Honor, the first question we have to look at, what is the principal object of the contract? And Kirby and Duaron both tell us, if a vessel is involved, is it relevant for that inquiry? So we have to... When you think about it... They didn't say it's irrelevant. It's not in itself sufficient. It's not in itself sufficient, yes. When we back up and look at why is that important? It's important because it protects items like, number one, what law is going to apply to the contract, and number two, jurisdiction in federal court. When you look at lightering, that's what that was. That was a jurisdiction case. And so it's your threshold question of, you want to get into federal court, why are you here? What's your reason for being here? You need some other independent basis if it's on land construction. Even if you could point to a barge, if it doesn't impact maritime commerce, then the federal interest in it lessens. If it impacts maritime commerce, like let's take the Kirby decision, you're going to take equipment from Australia and we're going to go all the way, thousands of miles, over 30 days, on an ocean-going vessel, and we're going to go to the eastern seaboard of the U.S.? No, that is a significant maritime commerce... I understand that the dock is land, but doesn't it impact maritime commerce? I mean, it would be very hard to have a ship without a dock. And, Your Honor, that is exactly what was discussed in the letter. That exact issue was... I mean, I respect lightering, but we're not bound by it. That's why I'm asking for the soul of this. Because I grew up on the river, and we had a dock. Without the dock, you wouldn't be able to launch the canoe and all of that kind of stuff. Or you could, but it would be very difficult depending on the kind of boat you were trying to launch. Certainly, I go on cruise ships all the time. I've never just jumped on one from the land. There was a dock, of sorts. Let me use the contracts in this case to show the distinction. Our contract is with UBT, which is a facility that's on land, and we are performing on-land construction. I would suggest to you that the line is drawn for jurisdiction and for maritime commerce there to where that is not maritime commerce. Let's take the other contract that's in this case. UBT also had a contract with River Ventures for vessels. For Jones X Seaman to operate the vessels and for captains. I think that is a perfect distinction here to draw that line. When you're building a dock on land, that's not maritime commerce. It's not Jones X Seaman. You're not navigating. It has less of a salty flavor. Certainly not the facts of this case, but what if hypothetically the facts showed that 95% of the work was done by people who were on the barge, but building a dock. And they would be Jones X Seaman in that situation, and that would certainly be a whole lot more weight on the side of what would be maritime commerce. In Dwaron, Judge Davis specifically addresses that. He says, there are factors to consider once you get to substantial use. One of them is, was there Jones X Seaman involved? That is directly in Dwaron. That is a factor that is to be used in that second analysis of substantial, of who's being involved to do this. Is it just dock workers or land workers? Or, as in River Ventures' contract with UBT, we're talking about navigation of vessels and captains. So you have UBT with two different contracts. One contract is for navigation of vessels. The other contract is for all land construction. I would suggest to you that the bright line should be drawn between those two. Because as Judge Jones mentioned earlier, suppose you're building a casino on land and you had to have a crane to drive some islands or something like that. Does that make the AC unit on there, maritime commerce? That's why we have the threshold. What about the purpose of the dock? What if it was the dock, you know, in the Bahamas they have a number of islands that are owned by cruise ship companies and on some of them the cruise ship has a dock where it sits in the middle of the water and the people on the ship get off on the dock and walk a good distance, a third of a mile maybe from the ship in the middle of the ocean to the island on the dock. Does that matter that the dock is connecting the island to a vessel out in the water as far as maritime commerce? Because that's the only purpose of that dock. I think you would have to back up and look at the object of it and how did that get built and, you know, those types of items are going to matter for maritime commerce as we spoke about. You know, are there Jones Act seamen? Did you need 20 vessels involved in the building of that? Those are going to be big factors when we're talking about commerce. It's like when Kirby looked at it and said it's a train derailment, let's back up. How did we get here? We got here by navigating thousands of miles in 30 days in maritime commerce. In this one, what is, back up and look at the principal object, what is it? On land construction. The captains on the vessels that River Ventures provided to UBT in their contract, back up and look at it, what are you doing? Well, the purpose on land construction sort of begs the question it's on land construction for what? It's on land construction for a dock which obviously is involved with maritime activities and vessels. I know that laddering is not binding, Your Honor, but that question was addressed in laddering and I thought that Judge Rosenthal's response was very good. What she did was she did an analysis on what is the principal object because in that one she had loading and unloading of vessels over here and a separate object of a lease of a dock and when she did the analysis, she said that while it's a dock it is simply incidental to maritime commerce. It is not maritime commerce. The dock lease, that is to say. The dock lease, which she found to be the principal object because she had two objects and she did an analysis on what percentage was the dock and what percentage was loading and unloading and then she found that the principal object was a lease at the dock and when that question was asked, hers was it's incidental, but it is not maritime commerce. I would suggest to you that that analysis is right on, consistent with all of the policies because we have to have that threshold question before you're going to come to the court. Why is Crescent what bearing does Crescent Energy have on this because you barely briefed that case. Crescent Energy has absolutely no application to this case. When you go back to look at our chart that we have on page 28 the first question on Crescent Energy is, is it the use of vessels for the exploration of oil and gas, that is the first prong which satisfies maritime commerce. So that one, they got to do the Duaron test because it was for oil and gas in Crescent Energy. We're still stuck on the first prong when you're dealing with a non-oil and gas setting like footnote 52 in Duaron. So Judge Davis was not contradicting Herb's Welding and so on when he said as to what I regard as the first prong of Kirby, our cases have long held that the drilling and production of oil and gas on navigable waters from a vessel is commercial maritime activity. But that's the first prong of Kirby, isn't it? My view. When you're looking at Crescent Energy, we used to talk about Crescent Energy for a second, you know, that is the vessel, all of the operations for the P&A activities on the vessel are on the vessel where the wireline unit is on the vessel. The workers are on the vessel. Julian Zaksina are on the vessel working the unit that happens to be hooked to the platform. Totally different from a situation where you would just transit those employees, drop them off at the platform and they do their work on the platform, they get back on the vessel and they come back, I believe that's 47 at Dwyeron, where this decision, the court said you should not include transportation in that. So even though the vessel transports, is it doing the work? And that's why it's exactly consistent with the Supreme Court. Well, suppose we do get to another prong, what I regard as another prong of Kirby, which is substantial use of a vessel. How much was the, as Judge Smith said, this contract contemplated the use of a work barge, how much was it used? Well, we know that it was not used enough for these workers to satisfy Chandra Speed Lattice as to be James Zaksina. And also, we know that there is testimony from... Is that on appeal? No, it's... No, it's the finding by the district court on that subject on appeal. You know, Your Honor, it was appealed initially by River Ventures, and that appeal has been dismissed. And the only thing that's been reserved is indemnity. So, the only issue... So the issue of was River Ventures 100% at fault? Was Centaur 0% at fault? And was Mr. Barrios a James Zaksina? That's all been resolved. He is not a James Zaksina. Centaur is 0% at fault. River Ventures is 100% at fault. So we're looking at that. We don't have to make any additional factual alternations on this case. That has been dismissed. This is the only issue before this court right now. Yeah, but if we were to hold that some version of draw-on applies to this situation, we would have to remand to find out how much the vessel was used, right? That's correct, Your Honor, because the district court, Judge Malazzo, decided that it was not maritime commerce, so she did not address the other factors. So when you look at the chart on 28, she answered the first question, no. And then she had to ask if it was maritime commerce based on footnote 52 and on Kirby. And when she answered no, it is a non-maritime contract, which brings me to my next discussion point, is the Louisiana anti- indemnity construction statute. I'll hit that very briefly. Things have changed since we briefed this at the district court, because I didn't have two findings. We had a factual determination. We did not have a factual determination on Jones Act status or longshore status. That's been resolved. We know Barrios is a longshoreman. Number one. Number two, Centaur is free of fault. When you look at I-2 of the Louisiana construction statute, you first have to ask River Ventures, what do you want? And when they tell you, I want insurance and I want additional assured status, that construction anti-indemnity statute could not be more clear. It says, if you are seeking insurance and you are seeking additional assured status, you may be able to get it if the person you're seeking it from has fault. And that factual determination is now final. That is a final judgment. When they dismiss their appeal, they also dismiss their opportunity to argue that, which makes I-2 come directly into play to where when we are free of fault, they cannot recover. Let's go back and let's talk about the policy of the anti-construction act. Louisiana has this statute because they want small companies not to be told by large companies like UBT, you need to indemnify and get insurance and provide additional assured status for free, not just to me, but to all of the contractors that I have out there. They thought that was voided. Insurance is voided. It's exactly what happened here. We have Centaur, a small company, contracting with UBT. There is a one-way indemnity. There is a one-way insurance where only Centaur is providing it to them. Those are absolutely void. There are carve-outs. One carve-out is you have to have evidence that you have covered the cost of the premium. They have none of that. The best they can do is they say that we considered it. When you look at the testimony on that, it is delineated in our brief. Our people clearly said in the corporate deposition we consider overhead, but when we're doing jobs, we consider labor, we consider supplies. That's how we do our bids. So there's no outlets on it. And really, when we look at that, when we're writing these contracts, there's a couple different ways that we do it. Sometimes we'll put a provision there that says that Centaur has to invoice UBT, and UBT then has an option to pay the invoice for the additional assured status. When you look at the contract in its case, there is no provision that talks about that. There's no provision in there that says it. In fact, it says the exact opposite. And what it says is that Centaur, at its own cost and expense, is to provide the insurance. And that's in the master service agreement. Let me ask you some dumb questions here. I assume you're representing an insurance company? I am representing Centaur. There is an insurance company behind it, but I represent Centaur the company. Well, fine, but this is Centaur Insurance versus, what is this, RiverVentures Insurance? Yes. That's correct. Okay, and you said RiverVentures had its own contract with UBT, right? RiverVentures had its own contract with UBT to provide vessels and captains for transportation. And so that clearly, in drawing the lines, that would be a maritime commerce and a maritime contract. There's no way around that for them. Just to give you a pinpoint site on the contract with UBT and Centaur, when you look at RECDOT 1020, the last sentence, it clearly says that the insurance is to be paid by Centaur. And then when also you look at the appellate doc 1019, and you look at 5.0, it says contractor at its sole cost and expenses to provide insurance. So not only is there not evidence of the insurance being paid, but also where 0% is false. So the construction antediluvian is going to apply. Thank you. Okay, thank you. Okay, Mr. Angereau. Yeah, okay. I want to just take a few seconds to respond to the Louisiana issues. The statute does not support the arguments that they're making. I don't have time to address that in our short time here, but I do want to mention that the only thing that was required in the construction statute was that there be evidence that the indemnitary recovered the cost of the required insurance. In the testimony 1073 and 1070 of the record, Centaur was paid its full bid price for the work. The overhead is included in every bid. And does overhead include insurance? Yes. So they satisfied the Louisiana statute. But what I want to talk about is I want to talk about, as the Advocacy Professor here, I really want to talk about maritime law. Because what they're asking is they're asking for a return to Davison Sons. They want a first step. What Duaron did was Duaron took out Davison Sons and substituted a two-part test for whether this contract furthers maritime commerce. So what they're asking is, okay, let's have a test. Does this further maritime commerce? And then, does this further maritime commerce? And that's not correct. What we need is a two-part test, just like in Duaron. And in fact, when... What are your two parts? What are your two parts? One, two. Quick. Okay. Number one, and this is in reply page nine, a contract to be performed or facilitate operations on navigable waters. It's almost identical to Duaron. And then the contract provides that the parties expect that a vessel or vessels will play a substantial role in the completion of the contract. The two-part test, it's in the reply page nine. And what that does is that takes Duaron, which was not maritime work. We're talking about work on a fixed platform, plugging and abandoning, not maritime at all, but involved... But it's on navigable waters in the sense it's on a fixed platform, just like the dock here. And it applies that Duaron test to this specific circumstance where we have work on navigable waters and we have substantial use of vessels. And so when we talk about the substantial use of vessels, Judge Smith, your hypothetical was right on point. And the point about that was that the answer that was given to you said it doesn't matter that 95%, you still have the first test. Because he has the brightline test. Because he has the brightline test. It fails. 95% of the work, vessels on navigable waters, if it relates to a fixed platform, if it relates to a pier, is not maritime. And so, when they said... And here's the secret to this case. When you go back, what I want you to do is... I'm going to give you homework. And what I want you to do is I want you to take the Crescent Energy case. And I want you to take this case. And if you think that there's a big difference between those two, then fine. Rule against me. But Crescent Energy is this case. The bid on its face is just like the bid in Crescent Energy. Vessels are going to be necessary because there wasn't enough room on the dock or on the platforms. And, you know, when counsel says Crescent Energy... Are you saying that the presence or absence of Jones Act seaman doesn't play any part in any of this? It doesn't have to draw on. But here's the point about that. Remember that the court found a fact question in the first place of Jones Act staffs, which means that there was a necessity that there be a question about 30%. But the question of where specifically this one worker spent the majority of his time or spent 30% of his time or not doesn't mean that the contract as a whole, the expectations of the parties... So what I want you to do is I want you to read Crescent Energy. Even if we went along with you on the first prong, where is any evidence in the second prong that satisfies Dwaron? This case is identical in that regard. Identical to Crescent Energy because in Crescent Energy there was not evidence. There was not evidence, Judge Jones, in Crescent Energy of the 30%. There was not. But what Judge Southwick said in that case is that a vessel, it's the expectations of the parties. And that's what the court said in Dwaron. That's what the court said also in Crescent Energy. And in Crescent Energy the court found that the contract was maritime because the work of the vessel was indispensable. Here, both parties, the testimony of both parties is that the work was necessary to perform the vessel work, was necessary to perform the contract. In fact, in this case it's even a better case than Crescent Energy because when they wrote the bid, they warned, the contractor warned and said, now this is going to be significantly higher in price. It's the expectations of what governs. Thank you very much. Thank you. Court will stand in recess for 10 minutes.